Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8083 | **DATE** | 11/15/2001 |
| **CASE TITLE** | Teresa Cooper vs. Larry G. Massanari | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** The Court directs the Clerk of the Court to enter judgment pursuant to Fed. R. Civ. P.58, denying the plaintiff's motion to reverse and/or remand [doc.# 17], and granting the Commissioner's motion to affirm [doc. # 18]. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 11/15/2001 | |
| | JJK courtroom deputy's initials | 01 NOV 15 AM 10:45 | date mailed notice | |
| | | Date/time received in central Clerk's Office | JJK mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERESA COOPER, ) | |
| ) | |
| Plaintiff, ) | Case No. 00 C 8083 |
| ) | |
| v. ) | Magistrate Judge Schenkier |
| ) | |
| LARRY G. MASSANARI, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Teresa Cooper, seeks judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI"), pursuant to 42 U.S.C. § 405(g)(2001). The plaintiff seeks summary judgment reversing the Commissioner's decision to deny her DIB and SSI or, in the alternative, a remand of the case to the Commissioner for further proceedings (doc. # 17). The Commissioner has filed a cross-motion for summary judgment to affirm his decision below (doc. # 18). By virtue of the consent of the parties pursuant to 28 U.S.C. § 636(c), the case has been assigned to this Court for all proceedings, including the entry of final judgment (doc. ## 13-15).

For the reasons stated below, the Court grants the Commissioner's motion for summary judgment, and denies Ms. Cooper's summary judgment motion.

## I.

On January 19, 1999, Teresa Cooper filed applications for DIB and SSI, alleging disability since January 1, 1998 due to mental retardation and frequent fainting spells (R. 77-79, 163-64). The state agency denied her claims initially and upon reconsideration (R. 167-68, 171-72). A hearing

was held before an Administrative Law Judge ("ALJ") on April 26, 2000 (R. 36-60). The ALJ denied Ms. Cooper's claim on June 27, 2000, and the Appeal Council denied her request for review on November 7, 2000 (R. 4-5, 8-25). Therefore, the ALJ's decision is the final decision of the Commissioner and subject to judicial review by the district court. *See Luna v. Halala*, 22 F.3d 687, 689 (7th Cir. 1994). On March 9, 2001, Ms. Cooper filed her complaint in federal court seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.

Teresa Cooper was born on December 28, 1973; she was twenty-six years old when the ALJ denied her claim for benefits (R. 77). She has completed the ninth grade, and was twice unsuccessful in attempts to obtain a GED (R. 40). Ms. Cooper is unable to read or write (R. 40). Between December 1995 and June 1996, she worked as a bus monitor for handicapped children, a job in which she worked five hours a day, five days a week (R. 43-44). Ms. Cooper also previously worked as a hotel housekeeper, cashier and packer, although none of those jobs lasted longer than one month (R. 56-57). There is no indication that Ms. Cooper was fired from any of those jobs due to physical or mental limitations. Rather, Ms. Cooper reported that she quit her job as a bus monitor when she moved out of state (R. 12, 118).

When Ms. Cooper was eight years old, a lawn dart pierced her temple and had to be surgically removed (R. 47-48). Ms. Cooper testified that as a result of this accident, she was hospitalized for one month, and she began experiencing blackout spells five years later, beginning at age thirteen (R. 47-48). Ms. Cooper alleges that she cannot work due to these frequent blackouts or fainting spells, which are triggered by heat and stress. According to Ms. Cooper, her blackouts occur four or five times a day, depending on her stress level, and last ten to fifteen minutes per

incident (R. 49-50). Ms. Cooper's husband testified that one of these episodes occurred while she was taking a shower. He claims that she threw up blood and he had to administer CPR (R. 52-55). Ms. Cooper visited the emergency room on December 9, 1999 following her fall in the shower, received pain medication, and was released (R. 149).

Ms. Cooper testified that she has not sought or received treatment for this condition of suffering fainting episodes, either as a child or an adult, claiming lack of money and health insurance (R. 50). However, one medical report indicates that Mr. Cooper is employed as a machine operator at Allen Engineering Company (R. 140), and it is not clear why Ms. Cooper would not be insured through Mr. Cooper's employment. Ms. Cooper further alleges that she cannot work due to mental retardation.

Ms. Cooper alleges a variety of limitations related to daily living. For example, Ms. Cooper helps her husband with much of the housework, but she testified that he does most of the cooking because she is afraid that she will hurt herself (R. 51). Mr. Cooper testified that he does all of the grocery shopping because Ms. Cooper cannot read, and that she has never applied for or received a driver's license because she is afraid to drive (R. 51-52).

On March 3, 1999, at the request of the Social Security Administration, Dr. Atkinson, a psychologist and licensed psychological examiner, performed an evaluation of Ms. Cooper's adaptive functioning. The Wechsler Adult Intelligence Scale (WAIS-III) testing produced a verbal IQ score of 67, performance IQ score of 64, and a full scale IQ score of 63 (R. 115). In the narrative evaluation of adaptive functioning that accompanied these scores, Dr. Atkinson noted that Ms. Cooper was unable to shop independently, unable to manage a checkbook or make change, needed to have help shopping for clothes, and unable to cook unless someone else was present to help her

(R. 116). Dr. Atkinson also noted that Ms. Cooper was capable of feeding, dressing, and bathing herself, and was also capable of doing laundry, sweeping, and vacuuming the house (R. 116). Dr. Atkinson reported no limitations in Ms. Cooper's speech and language or in her pace, persistence, and concentration (R. 117). In addition, Dr. Atkinson noted that Ms. Cooper was shy, although he reported no evidence of unusual passivity, dependency, aggression, impulsiveness, or withdrawal (R. 116). Dr. Atkinson reported that the results of the intellectual assessment, including IQ scores, were consistent with his evaluation of Ms. Cooper's adaptive functioning (R. 117).

Dr. Hester performed a physical examination of Ms. Cooper on March 24, 1999 (R. 118-25). He reported no physical abnormalities, and he found Ms. Cooper capable of all work-related tasks asked of her in the office (R. 125). Dr. Hester estimated her IQ at between 80 and 85 (R. 125). He diagnosed Ms. Cooper with below normal intelligence and fainting spells by history (R. 124); however, Dr. Hester noted that Ms. Cooper had never sought medical attention for these fainting spells (R. 118). In a consultative review dated July 6, 1999, the physician also noted that Ms. Cooper had never sought treatment for her fainting spells (R. 139). This report further noted that nothing in Ms. Cooper's file indicated "seizure-like activity" and that her physical impairments "could be rated not severe" (*Id.*).

Ms. Cooper also underwent an examination by Dan Donahue on April 15, 1999. Dr. Donahue, a psychologist, specifically addressed Ms. Cooper's functional work capacity, and determined that she was able to perform work "where interpersonal contact is incidental to work performed" (R. 137). This diagnosis was affirmed by another doctor examining Ms. Cooper on July 6, 1999 (*Id.*).

4

On October 19, 1999, at the request of the Social Security Administration, Dr. Tyrer administered a neurological examination of Ms. Cooper (R. 140). Ms. Cooper reported to Dr. Tyrer that she had experienced more than twenty-five blackout spells during the previous nine months (R. 140). Dr. Tyrer recommended further medical work, including an EEG and a CAT scan of her head (R. 140-41). In a medical assessment of Ms. Cooper's ability to perform Work-Related Activities, Dr. Tyrer noted that her ability to lift/carry, stand, walk, or sit would not be affected by her impairments (R. 142-45). He recommended that she never climb and that she be restricted from exposure to heights, moving machinery, and vibrations (R. 144-45).

On April 26, 2000, Ms. Cooper appeared before the ALJ. As part of the proceedings, the ALJ received testimony not only from Ms. Cooper and her husband, but also from a vocational work expert ("VE"). The VE considered the jobs available to a hypothetical person with the same functional capacity and limitations as the plaintiff. The VE testified that an individual with Ms. Cooper's limitations could perform jobs as a maid/cleaner or a packager. Furthermore, the VE estimated that there were roughly 8,000 maid/cleaner jobs and 5,500 packager jobs within the regional economy (R. 58). Ms. Cooper's attorney declined to question the vocational expert, arguing that Ms. Cooper satisfied the listing for 12.05(C) based on her IQ scores, learning disability, and her seizure disorder (Pl.'s Mem. at 4).

The ALJ issued a decision on June 27, 2000 (R. 8-25). The ALJ applied the standard five-step sequential evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.920. He made the following findings: (1) Ms. Cooper had not engaged in substantial gainful activity since her alleged onset date; (2) Ms. Cooper's impairment or combination of impairments are considered "severe" under the Act;

(3) the claimant's allegations regarding her ailments are "generally credible"; (4) Ms. Cooper's impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (5) Ms. Cooper has the residual functional capacity to perform work where interpersonal contact is only incidental to the work performed, where tasks can be no more complex than those learned and performed by rote, and only simple, direct supervision is required; (6) Ms. Cooper had no past, relevant work; (7) Ms. Cooper is illiterate; (8) Ms. Cooper is functionally capable of working as a maid/cleaner or packager, and there are a significant number of such jobs in her state; and (9) Ms. Cooper is not disabled as defined by the Social Security Act (R. 17). As noted above, the Appeals Council denied Ms. Cooper's request for review (R. 4), making the ALJ's decision the final decision of the Commissioner.

### III.

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Rather, the Court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405 (g) (1988), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by

substantial evidence and based upon proper legal criteria. *Erhart v. Secretary of Health and Human Service*, 969 F.2d 534, 538 (7th Cir. 1992).

Of course, this does not mean that the Commissioner (or ALJ) is entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his or her ultimate conclusion. *Herron*, 19 F.3d at 333. And, although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id*. *See also Young v. Secretary of Health and Human Services*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)).

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2001). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520 (2001); *see also Young*, 957 F.2d at 389. A finding of disability requires an affirmative answer at either Step 3 or Step 5. A negative answer at any step (other than Step 3) precludes a finding of

disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* The ALJ's analysis at Step 5 typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform a particular category of work (*i.e.*, skilled or unskilled and sedentary, light, medium, heavy or very heavy work), as well as the availability of such work in the national economy. *Corder v. Massanari*, No. 00 C 2714, 2001 WL 1355986, *1 (N.D. Ill. Nov. 1, 2001).

## IV.

On review, Ms. Cooper raises only one issue, namely, whether the Commissioner's decision denying her benefits should be reversed and/or remanded because at Step 3 the ALJ erroneously found that she did not meet the requirements of Listing 12.05(C) for mental retardation (Pl.'s Mem. at 1). The Commissioner argues that the ALJ correctly rejected Ms. Cooper's claim of disability at Step 3 because the record did not contain substantial medical evidence to support the findings necessary to satisfy Listing 12.05(C), which provides, in relevant part, as follows:

> 12.05 *Mental Retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05(C) (2001) (emphasis added).

Ms. Cooper argues that there is objective medical evidence to support a finding that she meets or equals Listing 12.05(C) because she has (a) a full scale IQ of 60-70, and (b) a physical or other mental impairment that imposes additional and significant work related limitations of function – that is, she is often dizzy and faints, and she is illiterate (Pl.'s Mem. at 14-15). The plaintiff argues that these "impairments" create an "additional and significant work-related limitation" (*Id.*). According to the plaintiff, to be significant, the limitation need only be more than slight or minimal (*Id.*, citing *Cook v. Bowen*, 797 F.2d 687, 690 (8th Cir. 1986)). The Commissioner argues that Ms. Cooper cannot satisfy the two elements of Listing 12.05(C), and that, additionally, she was required and also failed to establish a separate element of Listing 12.05: that she was "mentally retarded" (*i.e.*, that she had "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during her development[al] period (before she reached the age of 22))" (Def.'s Mem. at 6).

The parties' disagreement over whether a two-part or a three-part standard applies to Listing 12.05 is not dispositive here because the Court concludes that there is substantial evidence to support the ALJ's finding that Ms. Cooper cannot satisfy the "additional and significant work-related limitation" requirement of Listing 12.05(C). Thus, because the ALJ's finding at Step 3 must be affirmed (whether a two-part or three-part test under Listing 12.05 is employed), and because Ms. Cooper does not challenge the ALJ's finding at Step 5 that there exists a significant number of jobs she could perform, the Commissioner's decision must be affirmed.

That said, the Court will nonetheless first address what we believe to be the relevant standard of review under Listing 12.05(C), and then move to an analysis of the ALJ's findings at Step 3.

9

## A.

The Commissioner's position is that the Social Security Administration (the "Agency") has for many years applied a three-part standard under Listing 12.05(C) which requires, at the threshold, a showing by the plaintiff that she is mentally retarded. A recent set of revised regulations regarding the evaluation of mental impairments provides that an adjudicator must find that a claimant has mental retardation *before* proceeding to assess the severity factors set forth in the various subparts of Listing 12.05. *See* Revised Medical Criteria for Evaluating Medical Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50776 (August 21, 2000) (codified in 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00A (2001). In relevant part, the introduction to the revised regulations for mental disorders states as follows:

### 12.00 MENTAL DISORDERS

> A. *Introduction.* The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. * * * The structure of the listing for mental retardation (12.05) is different from that of the other mental disorder listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria, we will find that your impairment meets the listing.

Revised Medical Criteria for Evaluating Medical Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50776 (August 21, 2000) (codified in 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00 (2001)) (emphasis added). *Compare* 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00 (1999). A plain language reading of the paragraph quoted above makes clear that the Agency requires a claimant to show, at

the outset, that she is mentally retarded before proceeding to the requirements of Listing 12.05(C), namely, that the IQ score falls between 60-70, and that there exists an additional limiting mental or physical impairment.

The Seventh Circuit has previously applied only a two-part standard for claims under Listing of 12.05(C), without specifically addressing whether proof of mental retardation is separate and additional requirement of Listing 12.05. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). *Maggard* does proceed on the premise that mental retardation is shown by proof of the two elements in Listing 12.05(C). *Maggard*, 167 F.3d at 380. However, the Seventh Circuit case law on this issue predated the new regulations, which state that proof of mental retardation is to be treated as an element separate from the additional element needed to establish an impairment that meets Listing 12.05(C). Moreover, although the district court in *Hall v. Apfel*, 122 F. Supp. 2d 959 (N.D. Ill. 2000) recognized a split of authority, there has been no definitive ruling from the Seventh Circuit or the Supreme Court since the Agency's recent revision to Listing 12.00.

If this Court were remanding the case rather than affirming the ALJ's decision, the Court – absent specific guidance from the Seventh Circuit on the effect of the revised regulations – would give deference to the plain language of the revised regulation and require a three-part test to be applied on remand. *See generally, Godbey v. Apfel*, 238 F.3d 803, 810 (7th Cir. 2000) (applying new regulation promulgated in 65 Fed. Reg. 50746 (August 21, 2000) even though the new regulation was not the existing law when the ALJ made the initial decision and holding further that the ALJ need not comply with requirements of the old regulations on remand). However, the Court is not remanding the case, but is affirming the ALJ's decision. In explaining that affirmance, the Court will analyze the ALJ's decision using the two-part test that the Seventh Circuit previously has

11

employed (recognizing that because there is substantial evidence to support the ALJ's finding against the plaintiff on at least one of the elements in Listing 12.05(C), it makes no difference to the outcome of this case whether a two-part or three-part test applies).

### B.

We begin our analysis of the ALJ's decision with a basic and well-established rule of law: the ALJ need not evaluate in writing every piece of evidence in the record, and the ALJ's analysis must be articulated only at a minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id.*; *see also Young v. Secretary of Health and Human Services,* 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala,* No. 93 C 323, 1994 WL 66102, * 9 (N.D. Ill. March 3, 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing *Brown v. Bowen,* 847 F.2d 342, 346 (7th Cir. 1988)). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter,* 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

Applying the standards, we examine the ALJ's findings concerning the two specific elements set forth in of Listing 12.05(C).

### 1. A valid IQ of 60 through 70.

The ALJ acknowledged that the IQ scores reported by Dr. Atkinson would satisfy the requirement under Listing 12.05(C) for a "valid verbal, performance, or full scale IQ of 60 through 70" (R. 14). However, the ALJ did not squarely find that the plaintiff had met this element of the

Listing, or had failed to do so. Rather, the ALJ cited other evidence that he suggested would place that IQ scores in doubt, and then moved directly to a discussion of plaintiff's failure to meet the other element required by Listing 12.05(C).

Were the ALJ's ruling based on a finding that plaintiff had not established IQ scores that met the requirement of the Listing, we would be hard pressed to find substantial evidence supporting that conclusion. The ALJ noted that the IQ scores reported by Dr. Atkinson reflected the only set of IQ scores contained in the record (R. 14) – but the Court finds nothing in the record to show why these scores should be rejected, particularly when the testing was performed by a competent psychologist and licensed psychological examiner at the request of the Social Security Administration. Moreover, a consultative review by another physician characterized Dr. Atkinson's report a showing "a valid IQ in the 60s" (R. 127). While the ALJ referred to Dr. Hester's "estimate" of Ms. Cooper of having an IQ of 80 to 85 (R. 14), the evidence in the record is that Dr. Hester was asked to perform a general physical examination, not a psychological examination; he administered no formal IQ or other psychological tests; and there is no evidence in the record as to his credentials to assess IQ. The ALJ offers no explanation – and we see none – for preferring the untested estimation of Dr. Hester over the results of valid IQ tests performed by Dr. Atkinson.

2. **Adaptive Behaviors**

But ALJ's decision was not based on a rejection of the IQ scores reported by Dr. Atkinson. Listing 12.05(C) requires both a valid IQ score of 60 through 70 *and* a "physical or other mental impairment imposing an additional and significant work-related limitation of function." And on this point, the ALJ squarely found that plaintiff's claim fails because "the threshold requirement under Listing 12.05 for the accompanying deficits and adapted behaviors is not present in this matter" (R.

13

Listing, or had failed to do so. Rather, the ALJ cited other evidence that he suggested would place that IQ scores in doubt, and then moved directly to a discussion of plaintiff's failure to meet the other element required by Listing 12.05(C).

Were the ALJ's ruling based on a finding that plaintiff had not established IQ scores that met the requirement of the Listing, we would be hard pressed to find substantial evidence supporting that conclusion. The ALJ noted that the IQ scores reported by Dr. Atkinson reflected the only set of IQ scores contained in the record (R. 14) – but the Court finds nothing in the record to show why these scores should be rejected, particularly when the testing was performed by a competent psychologist and licensed psychological examiner at the request of the Social Security Administration. Moreover, a consultative review by another physician characterized Dr. Atkinson's report a showing "a valid IQ in the 60s" (R. 127). While the ALJ referred to Dr. Hester's "estimate" of Ms. Cooper of having an IQ at 80 to 85 (R. 14), the evidence in the record is that Dr. Hester was asked to perform a general physical examination, not a psychological examination; he administered no formal IQ or other psychological tests; and there is no evidence in the record as to his credentials to assess IQ. The ALJ offers no explanation – and we see none – for preferring the untested estimation of Dr. Hester over the results of valid IQ tests performed by Dr. Atkinson.

### 2. Adaptive Behaviors

But ALJ's decision was not based on a rejection of the IQ scores reported by Dr. Atkinson. Listing 12.05(C) requires both a valid IQ score of 60 through 70 *and* a "physical or other mental impairment imposing an additional and significant work-related limitation of function." And on this point, the ALJ squarely found that plaintiff's claim fails because "the threshold requirement under Listing 12.05 for the accompanying deficits and adapted behaviors is not present in this matter" (R.

14). The ALJ explained that "[w]ith regard to adaptive behaviors the claimant has maintained employment and reported that she stopped working on account of moving," and also reported "an ability to perform numerous household chores" (R. 14). The ALJ also cited as evidence that Ms. Cooper is cooperative, can carry on normal conversation, and has no physical limits in work related activity (*Id.*). As to her blackouts, the ALJ noted that the neurologist, Dr. Tyrer, did not find them significantly limiting (*Id.*).

The ALJ's opinion provides a sufficiently detailed factual discussion regarding Ms. Cooper's physical and mental capabilities and provides substantial evidence for his ultimate finding that Ms. Cooper does not satisfy Listing 12.05(C). For example, other than evidence that Ms. Cooper is "shy" and does not like to be around a lot of people at one time, there is no medical or other anecdotal evidence that she has social or interpersonal limitations (R. 113-14, 116). Although she only completed the ninth grade and had to take special education classes, there is no evidence that Ms. Cooper's illiteracy limits her abilities to communicate, take care of herself, or work (R. 114, 116). Although Dr. Atkinson noted that Ms. Cooper was "unable to shop independently" because she could not "make change" (R. 116), Ms. Cooper's own testimony that she *can* make change when she is in a store (R. 42) belies and contradicts Dr. Atkinson's observation and/or finding, and the ALJ, who found Ms. Cooper credible generally (R. 15), was entitled to rely on Ms. Cooper's own testimony and assessment of her abilities.

Moreover, Dr. Atkinson noted that Ms. Cooper can feed, dress, and bathe herself independently;" and is "capable of managing most activities relating to activities of daily living" (R. 115-116). These observations by Dr. Atkinson are supported by Ms. Cooper's own testimony acknowledging that she cleans her house and washes laundry (R. 51), and her written statements that

14

she has the ability to care for her personal hygiene and perform household duties (R. 93). And, there is no evidence – other than her own testimony and that of her husband – that Ms. Cooper's fainting spells and any related "fears" she may have about cooking, driving or anything else, rise to the level of limitations that would effect her health and safety, the health and safety of others or her ability to work (R. 117).

To the contrary, evidence of record also shows that Ms. Cooper held several jobs, all of which she left of her own volition – *not* because of her inability to function in the work place. This evidence is significant not only in showing that Ms. Cooper's illiteracy is not a substantial impediment to working, but also in providing support for the ALJ's conclusion that Ms. Cooper's reported history of blackouts does not materially affect her ability to function at work. Ms. Cooper bore the burden of satisfying all of the elements of Listing 12.05(C). *Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir. 1993). She has failed to meet that burden. Because Ms. Cooper does not challenge the ALJ's other findings – including the Step 5 finding, where the ALJ takes into account for Ms. Cooper's allegations regarding blackouts and her mental and social "limitations" in his RFC finding (R. 15, 17) – the Court affirms the decision of the Commissioner.[1]

---

[1] We note that even applying a three-part test, and treating mental retardation as a separate requirement for establishing an impairment under Listing 12.05(C), the evidence of Ms. Cooper's functional capabilities – along with Dr. Tyrer's report that Ms. Cooper reflected no evidence of cerebral retardation (R.14) – constitutes substantial evidence that plaintiff had not met that element. We agree that in order to establish significant limitation in adaptive functioning, a plaintiff must show those limitations in at least two of the following skill areas: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety" (Defs' Mem. at 6, Note 4 citing DSM-IV at 39). There is substantial evidence that would support a finding that Ms. Cooper failed to satisfy this standard.

## CONCLUSION

The Court directs the Clerk of the Court to enter a judgment pursuant to Fed. R. Civ. P. 58, denying the plaintiff's motion to reverse and/or remand (doc. # 17), and granting the Commissioner's motion to affirm (doc. # 18). This case is terminated.

**ENTERED:**

*/s/ Sidney I. Schenkier*
**Sidney I. Schenkier**
**United States Magistrate Judge**

Dated: November 15, 2001